UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

RUBIN SQUARED, INC. f/k/a BIO SCIENCE    :
CONTRACT PRODUCTION CORP,          :
             Plaintiff,        :      03 Civ. 10138 (PAC)
                               :
   -  against -                 :      <u>OPINION</u>
                               :      <u>AND ORDER</u>
CAMBREX CORPORATION,            :
             Defendant.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Rubin Squared Inc. ("Rubin Squared") brings this diversity action for fraud, negligent misrepresentation and breach of contract[1] against Defendant Cambrex Corp. ("Cambrex"). Plaintiff alleges that Defendant and its agents fraudulently induced Plaintiff to sell Defendant all significant assets of its corporate predecessor, Bio Science Contract Production Corp. ("Bio Science"), by making false promissory representations during the negotiations surrounding the transaction. Plaintiff also alleges that Defendant breached the Asset Purchase Agreement (the "APA") by violating the implied duty of good faith and fair dealing. Defendant now moves for summary judgment dismissing Plaintiff's claims in their entirety. The motion is granted, for the reasons set forth below.

## RELEVANT FACTS[2]

### I. Negotiations Leading to the Bio Science Sale

Defendant first made inquiries into the possibility of purchasing Bio Science, a contract biopharmaceutical manufacturer, as early as February 2000, with

---

[1] The parties agree that all claims are governed by Maryland law.
[2] These facts are derived from the parties' Local Rule 56.1 Statements and their supporting evidentiary submissions, and are undisputed unless otherwise indicated. Sources will be cited only when quoted.

negotiations beginning in earnest in February 2001.  During these negotiations, Plaintiff was represented by its principal Jacques Rubin, Bio Science's founder and CEO, his son Steve Rubin, Bio Science's President, Paul Walter ("Walter"), an experienced lawyer, and Jill Frew ("Frew"), an experienced investment banker.  The parties exchanged several draft letters of intent proposing different terms for the acquisition, culminating in a final letter of intent ("LOI") executed on March 2, 2001. The LOI set forth a non-binding offer by Cambrex of $120 million, with a potential additional $25 million in earn-out payments, based on a formula to be determined by the parties.  During March and April 2001, the parties negotiated over the final form of the APA.

Plaintiff asserts that in the course of these negotiations, Defendant's representatives made a series of oral representations designed to induce Plaintiff to agree to the transaction:

(1) Defendant would fund a $60 million expansion of Bio Science's facilities;

(2) During the earn-out period, Jacques Rubin would run the business as before with full authority over its operations, and no material changes would be made to the business without his consent;

(3) Jacques Rubin would be made a corporate vice president of Defendant;

(4) Defendant was not considering acquiring any Bio Science competitors and would not divert business from Bio Science to another entity; and

(5) Defendant would not divert Jacques Rubin's efforts from Bio Science in a manner that would inhibit achievement of the full earn-out.

On April 11, 2001, Walter wrote a letter to Defendant's counsel suggesting a number of additions be made to the earn-out clause of the APA. The Defendant rejected a statement that Defendant would provide the "reasonably necessary management, financial and operational resources and support" to achieve Bio Science's "strategic and growth plans." Declaration of Sander Bak ("Bak Dec."), Ex. 20 at CAM 20974-20975. Defendant also rejected a provision preventing it from acquiring a competing business without Plaintiff's consent. Defendant did, however, agree to Plaintiff's request to include a provision that Defendant "shall not re-direct a material portion of Jacques Rubin's time and/or responsibility away from the management of [Bio Science]." Id. at CAM 20975.

Based on testimony by Jacques Rubin and Walter, Plaintiff claims that Defendant's representatives explained its refusal to incorporate its remaining promises into the APA by stating that such provisions were unnecessary because: (1) Defendant had already agreed to them in negotiations and would adhere to its oral promises; and (2) their inclusion would "clutter up" the APA with needless details. Declaration of Harold M. Walter ("Walter Dec.") Ex. 11 at 110-11. Jacques Rubin also declares that Defendant's representatives stated that the APA was concerned only with the asset sale and not with operational issues, and therefore Defendant's promises as to post-sale operations should not be included. Declaration of Jacques Rubin ("Rubin Dec."), ¶ 41. Plaintiff asserts that it accepted this explanation, and on April 30, 2001, the parties signed the APA and certain other agreements designed to implement the acquisition, including an employment contract for Jacques Rubin.

**II. Relevant Terms of the APA and the Employment Contract**

Under the APA, Defendant acquired Bio Science from Plaintiff in return for $120 million, paid on the closing date of the transaction, plus up to $25 million in potential "earn-out" payments over the next four years (the "earn-out period"), based on a share of Bio Science's annual earnings before interest, taxes, depreciation, and amortizations ("EBITDA" or "earnings"). During the earn-out period, Plaintiff was entitled to one-third of Bio Science's annual earnings over $25 million.[3] The APA also included a slightly modified version of Plaintiff's requested prohibition on diverting Jacques Rubin's efforts: "Purchaser shall not re-direct a material portion of Jacques R. Rubin's time and/or responsibility, without his consent, away from management of the Business." Walter Dec. Ex. 2 at 8. Jacques Rubin's employment contract provided that he was President of Bio Science with "responsibility for managing the Bio Science business and achieving the [objectives] set for the organization, reporting directly to the Chief Operating Officer of Cambrex or his designee." Bak Dec. Ex. 33 at CAM 07626.

The APA contains an integration clause stating that the APA and the employment contracts "supersede all prior discussions and agreements between the parties hereto with respect to the subject matter hereof, and thereof," and "contain the "sole and entire agreement between the parties." Walter Dec. Ex. 2 at 54-55. Similarly, Jacques Rubin's employment agreement states that it "supersedes and replaces all prior written or verbal agreements between Bio Science and Cambrex regarding your terms of employment…." Bak Dec. Ex 33. at CAM 07629. Steve Rubin testified that he

---

[3] The earn-out payments were capped at $25 million total, regardless of Bio Science's actual earnings during the earn-out period.

4

understood, at the time he signed the final version of the APA,[4] "[t]hat anything discussed beforehand…[i]s not part of the agreement."  Walter Dec. Ex. 10 at 256-57. He further stated that he believed that there were "additional things that were going to be done outside of this agreement…primarily the expansion," but that he was told the more limited agreement was what "had to be presented to the board to get the transaction approved." Id. at 253-54.

**III. Defendant's Actions after the Acquisition**

After the acquisition, the Rubins' relationship with Defendant deteriorated, leading to their resignations in February 2002.  While the details of this deterioration are not relevant to the present action, the parties agree that Jacques Rubin was not made a corporate vice president, that Defendant did not invest in an expanded facility for Bio Science before the Rubins resigned, and that Defendant acquired Marathon, a competitor of Bio Science, in October, 2001 and placed Jacques Rubin in charge of both units.  Jacques Rubin testified and declares, without apparent contradiction by Defendant, that after the Marathon acquisition the most senior manager at Marathon independently bid on and signed a contract with an existing Bio Science client, Dynport, despite Rubin's instructions that Marathon and Bio Science were to bid on contracts jointly from a single sales office.  Marathon's prices under this contract were lower than the prices Bio Science was charging Dynport for comparable work.

The parties dispute whether Defendant blocked Jacques Rubin from exercising full authority over Bio Science.  Rubin testified and declares that Defendant stripped him of his authority to sign contracts with Bio Science customers without

---

[4] Jacques Rubin was on vacation when the APA was signed and authorized Steve Rubin to sign on behalf of Plaintiff.

Defendant's approval, attempted to interfere with his relationships with clients, and attempted to introduce operational changes at Bio Science.  Rubin acknowledged, however, that he prevented Defendant from successfully negotiating any lower prices with clients, and Plaintiff conceded at oral argument that Rubin successfully rejected Defendant's proposed operational changes. Oral Argument Transcript, 34.

## IV. Bio Science and Marathon Earnings

In 2000, the year prior to the sale, Bio Science's earnings were approximately $8.6 million.  In 2001, they were $16.8 million.  In 2002, the first full year after the sale, earnings declined to $13.7 million and in 2003 they were $5.4 million.  In 2004 and 2005 Bio Science's earnings were negative, by $266,590 and $7.5 million respectively.  Marathon's earnings were $5.5 million in 2002, but negative during 2003-2005.  The highest combined earnings achieved by Marathon and Bio Science were therefore roughly $19.2 million in 2002, still well below the earn-out threshold of $25 million.

## DISCUSSION

## I. Summary Judgment Standard

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate where "the nonmoving party 'has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof'." Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996) (quoting

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  In ruling on a motion for summary

judgment, the Court must "resolve all ambiguities and draw all factual inferences in favor

of the nonmoving party."  McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006) (citation

omitted).  Summary judgment should not be granted where issues of fact are "genuine,"

and "a reasonable jury could return a verdict for the nonmoving party." Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

**II. Fraud**

    Under Maryland law, the elements of a fraud claim are "(1) that the

defendant made a false representation to the plaintiff, (2) that its falsity was either known

to the defendant or that the representation was made with reckless indifference as to its

truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff,

(4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5)

that the plaintiff suffered compensable injury resulting from the misrepresentation." Nails

v. S&R, Inc., 639 A.2d 660, 668 (Md. 1994).  Plaintiff must present clear and convincing

evidence for each element of its claims. VF Corp. v. Wrexham Aviation Corp., 715 A.2d

188, 193 (Md. 1998).  Plaintiff alleges that it relied on Defendant's false representations

that it would fund the $60 million expansion and make Jacques Rubin a Cambrex vice-

president with complete control of Bio Science during the earn-out period, and that it

would not divert business from Bio Science and was not considering acquiring any of Bio

Science's competitors.  Plaintiff alleges that its injury due to its reliance was loss of the

$25 million earn-out.  Defendant argues that Plaintiff's fraud claim should be dismissed

for failure to show reasonable reliance, resulting injury, and intent to defraud.  Defendant

also argues that the alleged misrepresentations are too vague to be actionable, and that

Plaintiff has not shown that Defendant's promissory statements were false when made. The Court agrees that no reasonable jury could find reasonable reliance or injury here, and therefore does not rule on the issues of falsity, vagueness, or intent.

**A. Reasonable Reliance**

Plaintiff's case depends entirely on giving life to Defendant's alleged pre-contractual oral representations.  In the circumstances of this case, where Plaintiff's representatives, the Rubins, were sophisticated businesspeople represented in a multi-million dollar transaction by experienced legal and financial professionals, Plaintiff could not reasonably rely on those representations. Both the APA and the employment contracts contain integration clauses explicitly superceding all prior discussion and agreements.  The evidence clearly shows that Steve Rubin, who signed for Plaintiff with Jacques Rubin's full authority, understood the meaning of the integration clause, and was aware that Defendant's Board of Directors would be approving only the APA and not any pre-contractual promises.[5]

Reliance on alleged oral representations not included in the highly detailed and oft-revised APA was unreasonable.  In addition, many of the representations on which Plaintiff purportedly relied were explicitly rejected by Defendant when Plaintiff proposed their inclusion in the APA.  Plaintiff insists that it can rely on the rejected promises because Defendant explained its rejection by saying that the promises raised "operational issues" which would "clutter" the APA.  This explanation is nonsensical, especially when it is recalled that at least one of Plaintiff's requested provisions, barring diversion of Jacques Rubin's effort from Bio Science, was included in the APA.  The

---

[5] Indeed, Steve Rubin's testimony suggests that the alleged pre-contractual promises had to be actively concealed from the Board to secure its approval of the acquisition.

inclusion of one and the rejection of the rest renders Plaintiff's alleged reliance on the rejected statements unreasonable as a matter of law.

Courts applying Maryland law in similar circumstances have come to the same conclusion.  The D.C. Circuit's decision in One-O-One Enters., Inc. v. Caruso, 848 F.2d 1283 (D.C. Cir. 1988) is particularly on point.[6]  In One-O-One, the plaintiffs, sellers of 39 restaurants, asserted reliance on the defendant-buyers' pre-contractual representations despite the existence of an integration clause in the final agreement stating that it "supersede[d] any and all previous understandings and agreements." One-O-One, 848 F.2d at 1286.  The representations at issue were similar to those alleged here, amounting to promises that the defendants would "maintain and expand the [business] 'for the long-term future' and that they did not intend 'to sell or dispose of their ownership interest…in the near or foreseeable future.'" Id. at 1284.  The final agreement was, like the APA, "lengthy, detailed and comprehensive" and the product of "months of vigorous negotiations" during which "many offers, promises and representations were made and several preliminary agreements were drafted." Id. at 1286 (quoting One-O-One Enters., Inc. v. Caruso, 668 F. Supp. 693, 698 (D.D.C. 1987)).  There, as here, the "Plaintiffs [we]re sophisticated businesspersons who were represented by very capable counsel during the eight months of negotiations." One-O-One, 668 F.Supp. at 698.

The D.C. Circuit found that any reliance by plaintiffs on the pre-contractual representations was unreasonable under these circumstances.  The heart of the court's rationale was that "[o]n a matter of such large significance to the parties' bargain,

---

[6] The court in One-O-One found the law of Maryland and the District of Columbia to be the same in all relevant respects, and therefore did not engage in a choice of law analysis. One-O-One, 848 F.2d at 1286 n. 1.  Contrary to Plaintiff's suggestion, that does not mean that the Court did not apply Maryland law, but rather that it applied the identical laws of both Maryland and the District of Columbia.

silence in a final agreement containing an integration clause – in the face of prior explicit

representations – must be deemed an abandonment or excision of those earlier

representations." One-O-One, 848 F.2d at 1287.  Similarly, in Wootton Enterprises, Inc.

v. Subaru of America, Inc., the plaintiff, an automobile dealer, claimed that it had

renewed a franchise agreement with Subaru in reasonable reliance on pre-contractual

representations that Subaru would provide the necessary resources "to put [Wootton] in a

position to accomplish [its required sales]." 134 F.Supp.2d 698, 715 (D.Md. 2001).  The

court found that Wootton, as a Subaru franchisee for more than two decades, could not

reasonably rely on pre-contractual representations in light of an integration clause in the

agreement:

> Particularly because Wootton found Subaru's statement that it would put
> Wootton in the position to meet its sales objectives so important to its
> decision to renew the franchise agreement, and because (it now asserts) it
> understood that statement or promise as an unequivocal commitment of an
> increased allocation of desirable vehicles, it would have been
> unreasonable for Wootton to fail to insist that such a commitment be
> written into the franchise agreement.

Id.  The rationale of One-O-One and Wootton applies directly to the present action.

Plaintiff's claim is based on the proposition that Defendant's promises were of "large

significance to the parties' bargain."  Therefore it was unreasonable not to insist that they

be written into the APA.  Indeed, the argument against reliance is even stronger here, in

that inclusion of Defendant's alleged representations in the APA was actively discussed

and rejected.

Plaintiff's reliance on Greenfield v. Heckenbach, 797 A.2d 63 (Md. App.

2002) is misplaced.  Greenfield rejected the view that where a contract contains an

integration clause, "the parol evidence rule acted as a complete bar to the introduction

into evidence of any pre-contractual representations made by the sellers that would add to

or vary the written sales contract." <u>Id.</u> at 66.[7]  The court held that

> a plaintiff can successfully bring a tort action for fraud that is based on
> false pre-contract promises by the defendant even if (1) the written
> contract contains an integration clause and even if (2) the pre-contractual
> promises that constitute the fraud are not mentioned in the written
> contract.

<u>Id.</u> at 76.  Plaintiff's assertions notwithstanding, this holding does not address the issue

before the Court.  Neither <u>One-O-One</u> nor <u>Wootton</u> stand for the proposition that an

integration clause *bars* a fraud claim based on pre-contractual representations.  Rather,

each court considered the integration clause to be significant evidence of the

unreasonableness of reliance that, in combination with the other evidence, warranted

summary judgment.  The court in <u>Greenfield</u> itself noted that the "presence of the

integration clause goes directly to the disputed factual question of whether… the

Greenfields reasonably relied on [defendant's] representations." <u>Id.</u> at 77-78.  The denial

of summary judgment in <u>Greenfield</u> was, therefore, a product of its particular facts, rather

than a determination that reliance can never be found to be unreasonable as a matter of

law based in part on the existence of an integration clause.[8]

        The facts of <u>Greenfield</u>, however, are notably dissimilar from those of the

case at bar.  The relevant transaction concerned the purchase of an improved parcel of

---

[7] In the process, the court explicitly rejected the contrary holding of <u>Call Carl Inc. v. BP Oil Corp.</u>, 554 F.2d 623 (4th Cir. 1977). Plaintiff places great importance on this rejection, suggesting that it fatally undermines <u>One-O-One</u>, which cited <u>Call Carl</u> on a number of occasions.  To the extent <u>One-O-One</u> relied on <u>Call Carl</u>, however, it related to the elements of a fraud claim under Maryland law, which were correctly stated, and to the parol evidence rule, which is not an issue in the present motion.  The court's holding as to reasonable reliance was not in any way dependant on <u>Call Carl</u>, and so is not undermined by <u>Greenfield</u>'s rejection of that case.

[8] <u>Capital Ctr. LLC v. Wilkinson</u>, No. RDB 04-182, 2006 U.S. Dist. LEXIS 13121 (D. Md. Mar. 27, 2006), on which plaintiff also relies, similarly stands only for the proposition that an integration clause does not bar a tort action based on pre-contractual representations not included in the contract.  The issue of reasonable reliance was not even before the court, and the case is therefore irrelevant.

land by one couple, the Greenfields, from another couple that resided there, rather than a major commercial agreement between corporations. Id. at 66.  The representation at issue was that the sellers did not intend to build structures on a neighboring property that would obstruct the plaintiffs' view. Id.  A couple relying on such a promise in a non-commercial real estate sale is a far cry from a corporation consummating a nine-figure acquisition relying on oral promises representing both a massive financial investment and the allocation of operational control.[9]  A reasonable jury might have found that the Greenfields were reasonable in their reliance.  It would not be possible for a jury to find reasonable reliance by the Rubins.

**B. Injury**

To prevail on its claim, Plaintiff "must show that there is a reasonable probability or reasonable certainty that the act complained of caused the injury suffered.  Mere possibility is not enough." Prudential Securities Inc. v. E-Net, Inc., 780 A.2d 359, 376 (Md. App. 2001).  The parties agree that to establish this element Plaintiff must demonstrate that Defendant's failure to fulfill its alleged pre-contractual promises prevented Plaintiff from achieving some or all of the $25 million earn-out.  The evidence presented, however, demonstrates that Bio Science never approached annual earnings of $25 million, and Plaintiff presents no evidence demonstrating how Bio Science could have done so even if Defendant had kept its promises.  Plaintiff cannot, therefore, show a reasonable probability that Defendant's misrepresentations caused his failure to achieve the earn-out, and Plaintiff's fraud claim must be dismissed for failure to establish injury.

---

[9] That the Greenfields were both attorneys and had previously bought and sold land hardly renders the situations comparable. See Greenfield, 797 A.2d at 70.

The highest annual earnings achieved by Bio Science during the earn-out period were $13.7 million in 2002, little more than half the necessary amount. Even assuming that Defendant diverted business to Marathon, and allocating *all* of Marathon's earnings to Bio Science, Bio Science's earnings would still have peaked at $19.2 million in 2002. This artificially inflated peak is still substantially less than the trigger point for the earn-out.[10] There is no evidence that Bio Science would have increased its earnings sufficiently to close that gap if not for Defendant's misrepresentations.

Plaintiff offers the report of its expert, John H. Wills ("Wills"), to support its claim of injury. Wills calculated a number of projections for Bio Science's earnings during the earn-out period based on Bio Science's 2001 revenue growth rate, the applicable industry and sub-industry growth rates, and the expenditures projected by Defendant's management prior to the acquisition.[11] Wills also adjusted the expected revenue beginning in 2003 to account for capacity limitations on the Bio Science facility. In so doing, he made separate projections for revenue with and without the facility expansion allegedly promised by Defendant. Wills' projections show that the expected earnings for Bio Science without any expansion increased from approximately $28.5 million in 2002 to $40.5 million in 2005. The failure to expand the facility was estimated to have its first impact in 2003, by capping expected revenues at $66 million. Assuming the expansion was carried out, Wills estimated the expected earnings would have risen from approximately $28.5 million in 2002 to $95.5 million in 2005. Under the

---

[10] Even more favorable assumptions are similarly inadequate to support Plaintiff's claim of injury. Assuming that all Marathon sales in 2002 had been diverted from Bio Science, and that Bio Science would have incurred no additional cost to generate those sales other than the cost of the goods sold, the increased revenue would have been $19,339,457 in sales less $10,503,427 in costs of goods sold, or only $8,836,030. See Bak Dec. Ex. 3. Including that sum, Bio Science's earnings would still have been approximately $2.5 million below the earn-out threshold.

[11] Wills' expenditure projections were drawn from management's "base case" expense-to-revenue ratio.

projections, Plaintiff would have been entitled to the full $25 million in earn-out payments if the $60 million expansion had occurred and $14 million if it had not.[12]

   Wills never analyzed the actual cause of the dramatic shortfall in Bio Science's actual earnings as compared to his projections.  He was asked at his deposition if he had "any opinion as to whether or not any of these three allegations are the reason for the decline in Bio Science's performance postacquisition [sic]."  Wills replied that "we didn't opine on the liability aspects of the case." Walter Dec. Ex. 48 at 53-54. Similarly, when asked whether "the allegations in the complaint are the reason why Bio Science failed to perform as well postacquisition [sic] as it had performed prior to the acquisition," Wills replied, "I acknowledge there has to be a causal link.  We weren't specifically engaged to do the liability work and the causal testimony associated with that." Id. at 55.  And again, when asked whether "the allegations in this complaint are the only factors that contributed to Bio Science's poor performance," Wills replied that "I didn't link the specific acts alleged and do the liability analysis." Id. at 57.  Wills further acknowledged that he had not reviewed the post-acquisition operations of Bio Science or Defendant, and conceded that a variety of factors aside from Defendant's alleged misrepresentations could have led to a decline in Bio Science's financial performance.

   Wills' report confirms that he never analyzed the cause of Bio Science's financial shortfall.  Instead, his report assumes causation: "we further *understand* that the damages alleged result from Cambrex's actions as further elaborated in the Complaint…." Walter Dec. Ex. 44 at 1 (emphasis added).  Later, the report notes that "the Complaint filed in this matter alleges that the reasons for the decline in the financial

---

[12] Wills also notes that Plaintiff would have achieved the earn-out under Defendant's own internal projections and the projections announced in Defendant's press release regarding the acquisition, as well as under the projections of Plaintiff's investment bankers.

performance are attributable to actions take by Cambrex subsequent to the acquisition"
and lists certain of the allegations.  Id. at 7.  The report continues by relating the
statement of Jacques and Steve Rubin that Defendant had caused Bio Science's financial
decline.  Wills does not, however, analyze or assess the allegations in the Complaint or
the assertions of the Rubins; he merely parrots them.  Similarly, while noting that Bio
Science out-performed its market prior to the acquisition and under-performed it
afterwards, the report states that "[t]he plaintiff in this case attributes the under-
performance to specific actions by Cambrex," id. at 10, but does not evaluate that
attribution.  Finally, the report relays a variety of factors causing Bio Science's over-
performance of the market prior to the acquisition, some provided by the Rubins and
some contained in a presentation by Defendant's management to Defendant's Board of
Directors.  Wills never assessed the accuracy of these explanations; nor does he
determine whether these factors continued or ended after the acquisition.  As a result,
there is no basis to evaluate their role in Bio Science's post-acquisition difficulties.

       Wills' supplemental report makes the lack of causation analysis even
clearer.  In response to the assertion of Defendant's expert that Defendant had no
economic incentive to hold down Bio Science revenues given the structure of the earn-
out, Wills notes that an incentive would exist to divert revenue to another business unit,
and that the acquisition of Marathon provided a unit which could be used for that
purpose.  Wills then relates statements by Jacques Rubin regarding the supposed
diversion of the Dynport contract.  Immediately afterwards, however, Wills clarifies his
position:

> Let me be clear that I agree that it makes no economic sense to reject a
> $117 million earnings stream [Bio Science's total earnings less the earn-

> out payments under Wills' non-expansion projection].  I also want to
> confirm that I never asserted that it did make economic sense to reject
> such an earnings stream.  What I have asserted is that the Bio Science
> unit's financial performance subsequent to the acquisition by Cambrex,
> while under the control of Cambrex, lagged its prior performance and the
> overall market.  I do not believe Cambrex management rejected earnings,
> but the allegations in the plaintiff's claim assert that Cambrex
> management is responsible for the inferior performance of the Bio Science
> unit.

Walter Dec. Ex. 45 at 4.  Wills is plainly taking no position on the causal argument made

by the plaintiff, and if anything he appears to disavow that argument.

Nonetheless, Plaintiff argues that Wills' report establishes that the

Defendant's wrongful conduct as set forth in the Complaint was the cause of Plaintiff's

failure to achieve the earn-out.   In support, Plaintiff points to certain statements by Wills.

See Walter Dec. Ex. 48 at 54 ("I think there's a causal link"); id. at 57-58 ("the damages

calculation is based on the combined impact of the allegations.  And the specific

approach taken was estimating what the financial performance would have been absent

those acts for the [earn-out period]"); id. at 59-60 ("The allegations in this complaint and

the analysis I did are the bases for why the financial performance declined

postacquisition [sic] and collectively are the reason.").  As the last statement shows,

however, the "causal link" is not demonstrated by Wills' analysis, but rather by the

Complaint and Plaintiff's allegations generally.  Wills' analysis assumes causation, and

relies on the truth of Plaintiff's assertions to "collectively" demonstrate that the shortfall

was the result of Defendant's misrepresentations.

Plaintiff also points to the statement in Wills' report that "we computed

what the expected sales and associated [earnings] would have been…'but for' the alleged

actions of Cambrex…." Walter Dec. Ex. 44 at 2; see also id. at 11 ("The estimated

revenue for Bio Science for 2002 to 2005, 'but for' the actions of Cambrex alleged by

Plaintiff, was then computed.")  The report as a whole makes plain, however, that these

references to "but for" cause stated the *assumption* under which Wills operated, not an

independent finding of causation.  This point is best demonstrated, ironically, in

Plaintiff's own Local Rule 56.1 Statement, which states that "Mr. Wills found that but for

the alleged actions of Cambrex (concerning the occurrence of which Mr. Wills expresses

no opinion)," Plaintiff would have achieved the earn-out. Plaintiff's Local Rule 56.1

Statement, ¶ 215.  Wills does not even determine whether the actions in question *actually

took place*; he simply assumes it.

Wills' evidence is insufficient to create a genuine issue of fact as to

Plaintiff's injury.  Even taking Wills' projections as an accurate determination of what

Bio Science's earnings "should" have been, all things being equal, they are not evidence

that Defendant's failure to fulfill its promises caused the shortfall.  As noted, Plaintiff

must therefore rely on its own allegations to demonstrate the causal link between

Defendant's broken promises and Bio Science's decline.  Those allegations of causation,

however, are supported only by Jacques Rubin's declaration that "it is my belief that but

for Cambrex's failure to [fulfill its promises], Bio Science would have achieved the

necessary EDITA…." Rubin Dec., ¶ 76.  Rubin's listing of the factors on which his belief

is based does not convert it into an expert opinion.  This conclusory statement is not

based on personal knowledge; it is only a belief and adds nothing to the Complaint's

allegations.  It is totally insufficient to raise any genuine issue of fact.

Plaintiff's causation argument therefore amounts to little more than an ipse dixit, and a reasonable jury could not determine causation by mere inference from Wills' projections.  The difference between Wills' projections of enormous growth and the actual collapse of Bio Science's business, which became a net operating loss for Defendant by 2004, is not obviously the result of Defendant's unfulfilled promises.  The failure to make Jacques Rubin a Cambrex corporate vice president, for example, did not cause Bio Science's collapse.  Marathon's simultaneous collapse and consistent low earnings demonstrates that diversion of Bio Science business did not cause Bio Science's failure.  Wills' own analysis suggests that Defendant's supposed promise to expand the Bio Science facility was entirely irrelevant to Bio Science's decline in earnings.  Wills' found that capacity limitations without such a facility would have restricted Bio Science annual revenues to $66 million.  As Bio Science's annual revenues never reached $40 million, it would appear that the failure to expand had no impact on earnings.[13]  The evidence shows that three of the four broken promises did not cause the spread between expected and actual earnings.  Plaintiff's argument, that a shortfall following unkept promises, standing alone, shows a reasonable probability that the broken promises were the cause, is a pure example of post hoc ergo propter hoc.  Moreover, it ignores all of the myriad interacting factors that could have conceivably determined the success or failure of Bio Science.  Plaintiff cites no case finding damages causation in comparable circumstances based on comparable evidence.[14]  A reasonable jury could not find that it

---

[13] Limited capacity could have less obvious effects, of course.  It is conceivable, for example, that limited capacity reduced Bio Science's earnings by preventing it from obtaining contracts larger than its existing capacity could accommodate.  Wills' report is insufficient evidence of injury precisely because it is impossible to determine from it whether there was any such impact.

[14] The sole case Plaintiff cites that presents even vaguely comparable facts, Horizon Holdings, L.L.C. v. Genmar Holdings, Inc., found that damages from failure to achieve an earn-out were not too speculative to be recovered under Delaware law, but did not consider whether the plaintiff had demonstrated that the

was reasonably probable, let alone reasonably certain, that Defendant's failure to fulfill

its alleged pre-contractual promises caused Plaintiff's failure to achieve the earn-out, and

Plaintiff's fraud claim must be dismissed on this basis, as well.

### III. Negligent Misrepresentation

A claim of negligent misrepresentation requires that Plaintiff show, <u>inter

alia</u>, reasonable reliance and "damage proximately caused by the defendant's

negligence." <u>Gross v. Sussex</u>, 332 Md. 247, 259 (1993).  As just discussed, Plaintiff has

failed to show reasonable reliance on Defendant's alleged misrepresentations, or any

injury proximately caused by those misrepresentations.  Accordingly, Plaintiff's

negligent misrepresentation claim must also be dismissed.

### IV. Breach of Contract

Plaintiff's breach of contract claim relies on Defendant's alleged breach of

the "implied duty that each of the parties thereto will act in good faith and deal fairly with

the others." <u>Food Fair Stores, Inc. v. Blumberg</u>, 200 A.2d 166, 174 (Md. 1964).  The

scope of this implied duty under Maryland law is limited:

> In short, while the implied duty of good faith and fair dealing as
> recognized in Maryland requires that one party to a contract not frustrate
> the other party's performance, it is not understood to interpose new
> obligations about which the contract is silent, even if inclusion of the
> obligation is thought to be logical and wise.  An implied duty is simply a
> recognition of conditions inherent in expressed promises.  Thus, if a party
> promises to pay for its purchase of a business from the profits of a
> business, inherent in this promise is the agreement that the promisor will
> exercise reasonable diligence in continuing to conduct the
> business…Stated otherwise, under the duty of good faith and fair dealing,
> a party impliedly promises to refrain from doing anything that will have

---

defendant's misrepresentations had caused that failure. 241 F. Supp. 2d 1123, 1154 (D. Kan. 2002).

the effect of injuring or frustrating the right of the other party to receive
the fruits of the contract between them.

Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp., 213 F.3d 175, 184 (4th Cir. 2000)
(internal citations omitted).  Plaintiff has not raised a genuine issue as to facts adequate to
support a finding that Defendant breached this implied duty.  Moreover, even if sufficient
evidence had been presented as to breach, Plaintiff has failed to adequately show
damages caused by the alleged breach, for the reasons noted above.[15]  Both failings
require dismissal of the claim.

      Plaintiff asserts that Defendant's failure to fulfill its pre-contractual
promises had the effect of frustrating Plaintiff's right to achieve the earn-out, thereby
breaching the implied duty.  That is plainly incorrect as to certain of the alleged promises.
The appointment of Jacques Rubin to a Cambrex vice-presidency, for one, was not
"inherent in expressed promises" contained in the APA, and Defendant's failure to fulfill
it did not frustrate Plaintiff's right to achieve the earn-out.  Similarly, the implied duty of
good faith and fair dealing cannot possibly be understood to require that Defendant
provide a $60 million facilities expansion when such a term was not included in the
contract, particularly when language supporting such an obligation was expressly rejected
by Defendant.[16]

      Plaintiff's failure to cede total operational control of Bio Science to
Jacques Rubin is also, in itself, no violation of the implied duty.  A buyer is not obligated
to relinquish total operational control to the former CEO and controlling shareholder of

---

[15] In light of its earlier analysis, the Court will not address the damages question further.  The violations of
the implied duty of good faith and fair dealing alleged by Plaintiff are the same broken promises that
underlie its misrepresentation claims, and the change in the cause of action does not alter the inadequacy of
Plaintiff's evidence of causation.
[16] Wills' figures also make clear that expansion was not required for Plaintiff to achieve the earn-out, and
therefore failure to expand did not frustrate Plaintiff's right to the earn-out.

an acquired company merely because the acquisition agreement includes a profit-sharing

clause.  If Plaintiff had demonstrated that Defendant had overridden Jacques Rubin's

authority in particular ways designed to undermine Bio Science's earnings, however, a

jury might be able to find such a violation.  Plaintiff produces no evidence of such

conduct, however, and indeed conceded at oral argument that Jacques Rubin successfully

rejected attempts by Defendant to change operational practices. Oral Argument

Transcript, 34.  Plaintiff relies instead on the diversion of Jacques Rubin's time caused by

fighting such bureaucratic battles, on his inability to negotiate final deals with clients

without the approval of committees, and on Defendant's willingness to renegotiate deals

with customers.  See id. at 34-35.  None of these practices appear intended or likely to

frustrate Plaintiff's achievement of the earn-out, and indeed were foreseeable

consequences of Bio Science's acquisition by a larger corporation.

          The assertion of bad faith relating to the acquisition of Marathon could in

principle have merit.  There are three components to Defendant's conduct in relation to

Marathon: (1) the acquisition itself; (2) Defendant's assignment of Jacques Rubin to

supervise Marathon's operations; and (3) the alleged diversion of resources to Marathon.

The acquisition of Marathon cannot constitute a violation of the duty of good faith and

fair dealing.  An earn-out provision in a corporate acquisition agreement does not

inherently prohibit the buyer from acquiring the purchased company's competitors in the

future, nor does such a later acquisition naturally prevent the first-acquired company

from increasing its earnings.  Moreover, Plaintiff explicitly requested and was denied a

veto over future acquisitions, making it plain that the APA allowed Defendant to make

such acquisitions.  As to diversion of Jacques Rubin's time from Bio Science, the APA

contained an explicit provision barring Defendant from re-directing "a material portion" of Rubin's efforts from Bio Science unless he consented. Plaintiff does not allege that Defendant violated this provision of the APA by giving Rubin responsibility for Marathon, and therefore it cannot sustain a claim that the same conduct violated an implied duty.

Diversion of revenue to, or expenses from, Marathon would, by contrast, likely constitute bad faith. It is inherent in an agreement to share a percentage of a business unit's earnings that the unit's earnings will not be artificially diverted to another unit not covered by such profit-sharing obligations. Plaintiff has not presented any evidence of diversion of revenue by Defendant, however. The sole evidence even vaguely relevant to the point, Jacques Rubin's deposition testimony and declaration concerning the Dynport contract, does not constitute diversion. That Marathon continued to compete for contracts even after being acquired by Defendant does not constitute bad faith on Defendant's part, nor does the fact that Marathon charged lower prices, giving the client leverage to renegotiate with Bio Science. The APA did not contain any provision suggesting that Jacques Rubin would control any competing companies acquired by Defendant or that such companies would be run to maximize Bio Science's earnings. Plaintiff, in essence, suggests that Defendant could only abide by its implied duty of good faith and fair dealing if, having purchased Marathon, it restrained it from competing with Bio Science as it had prior to the acquisition. Maryland's law makes no such demands. Unless Defendant actively diverted Bio Science's earnings to Marathon, it did not act in bad faith.

The above analysis of Defendant's asserted bad faith conduct makes clear that Plaintiff's reliance on O'Tool v. Genmar Holdings, Inc., 387 F.3d 1188 (10th Cir. 2004), a Tenth Circuit decision applying Delaware law, is misplaced.  Setting aside any potential difference between Delaware and Maryland law, the conduct at issue in O'Tool is of an entirely different caliber than Defendant's actions here.  O'Tool concerned the acquisition of one recreational boat manufacturer, Horizon, by another, Genmar, in which the agreement provided for an earn-out to Horizon as long as it achieved a certain gross profit percentage.  Id. at 1190-1191.  The earn-out was calculated based on a percentage of annual revenues from the sale of Horizon brand boats and associated products, and the manufacture of Genmar brand boats. Id. at 1191.  Under this system, sales of Horizon products produced greater earn-out consideration than manufacture of Genmar products. Id. at 1191-1192.  The court found sufficient evidence for a reasonable fact-finder to conclude that Genmar violated the implied duty of good faith and fair dealing by, at a minimum, (1) immediately changing the brand name of Horizon's boats; (2) requiring that Horizon prioritize production of non-Horizon boats; (3) imposing significant design and production costs on Horizon associated with producing Genmar-brand boats, while limiting reimbursement to a lower "standard cost" of production; and (4) "flipping" Horizon boat dealers to other Genmar brands.  Id. at 1197.

Genmar, in short, took affirmative actions which had the natural result of reducing the earn-out Horizon could realize by restricting sales of Horizon products, while simultaneously holding down Horizon's profit percentage by requiring it to shoulder un-reimbursed design and production costs for Genmar products.  In addition, there was "ample evidence" that Genmar intended to prevent Horizon from achieving the

earn-out. Id. (internal quotation omitted).  In sharp contrast, there is no evidence of

specific affirmative actions taken by Defendant to impede Plaintiff's achievement of the

earn-out.  Nor is there substantial evidence that Defendant intended to do so.  Absent any

evidence of affirmative efforts to impede the earn-out, no reasonable jury could find that

Defendant has breached its implied duty of good faith and fair dealing, and Plaintiff's

breach of contract claim must therefore be dismissed.

## CONCLUSION

Defendant's motion for summary judgment is GRANTED.  Plaintiff's

claims are dismissed in their entirety, and the Clerk of the Court is directed to close out

this case.

Dated:  New York, New York
        August 24, 2007

SO ORDERED

PAUL A. CROTTY
United States District Judge

Copies E-mailed By Chambers On: 8/24/07
By: Marlon Ovalles - C.R.D.

24